UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THERESA BYRNE, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 1383 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| THE CITY OF CHICAGO and JOHN SCHULER, | ) | |
| | ) | |
| Defendants. | ) | |

**M<span style="font-variant:small-caps">EMORANDUM</span> O<span style="font-variant:small-caps">PINION AND</span> O<span style="font-variant:small-caps">RDER</span>**

Theresa Byrne brings claims against the City of Chicago and Chicago police officer John Schuler under 42 U.S.C. § 1983 and Illinois law. After Schuler moved to dismiss the original complaint, Doc. 22, and the City moved for a more definite statement, Doc. 24, Byrne filed an amended complaint, Doc. 38. Defendants move separately under Civil Rule 12(b)(6) to dismiss the amended complaint. Docs. 42, 44. The motions are granted in part and denied in part.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Byrne's briefs opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Byrne as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the

1

facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

On February 25, 2018, Schuler and Byrne, who were involved in a romantic relationship, drank alcohol at a bar to the point of intoxication. Doc. 38 at ¶¶ 37, 40-41, 44. Later at Schuler's residence, Schuler verbally abused Byrne. *Id*. at ¶¶ 45-46. Despite knowing that Byrne was intoxicated and that she had no experience with firearms, Schuler placed his service weapon on a table in front of her and said: "You should use this on yourself." *Id*. at ¶¶ 47-49. At the time, Schuler knew that the weapon, a semi-automatic handgun, was loaded with the safety off. *Id*. at ¶¶ 50-52. Byrne decided to go home. *Id*. at ¶ 53.

The last thing Byrne remembers from that night is leaning over to put on her boots. *Ibid*. Schuler's weapon discharged and struck her in the chin, dislodging pieces of her jaw, tongue, teeth, and cheek. *Id*. at ¶¶ 54, 57. Byrne does not know whether Schuler shot her or whether she shot herself, so she pleads both facts in the alternative, as permitted by Rule 8(d)(2). *Id*. at ¶¶ 55-56. Byrne sustained serious and permanent injuries, requiring her to undergo several intensive and painful reconstructive surgeries. *Id*. at ¶ 59.

Prior to that evening, the Chicago Police Department ("CPD") had received over fifty complaints about Schuler. *Id*. at ¶ 8-9. Numerous Chicago entities investigated the complaints, including the Independent Police Review Authority ("IPRA") and the Bureau of Internal Affairs ("BIA"). *Id*. at ¶ 10. Based on those complaints, the City knew or should have known that Schuler had a substance abuse problem with alcohol. *Id*. at ¶ 12. Two complaints, one in 1998 and the other in 2008, involved Schuler driving under the influence. *Id*. at ¶¶ 13-14, 16-17. As to the 1998 incident, Schuler was arrested and charged with a DUI, and received a five-day suspension from the force. *Id*. at ¶¶ 13, 15. As to the 2008 incident, Schuler received a five-day

suspension. *Id*. at ¶ 19. Chicago police officers typically receive a thirty-day suspension for a first DUI, followed by termination for a second. *Id*. at ¶¶ 20-21.

The City also knew or should have known that Schuler had a history of excessive force and violence. At least twenty-six of the complaints alleged excessive force. *Id*. at ¶ 11. Another complaint alleged a May 2012 incident in which Schuler got drunk and threw a full beer bottle at a bartender, striking her in the head and injuring her. *Id*. at ¶ 23. The bartender sued Schuler and the City, and the City settled for $75,000. *Id*. at ¶¶ 22, 27. The bartender was dissuaded from filing a criminal complaint against Schuler by other Chicago police officers, who implied that they would shut down her bar and falsely accuse her of stealing Schuler's cell phone. *Id*. at ¶ 25. The City did not discipline Schuler for this incident, but instead promoted him to sergeant, *id*. at ¶¶ 28-29, and even placed him in charge of investigating misconduct by other officers, *id*. at ¶ 61. In another incident, an intoxicated Schuler threw a pool cue, made threatening remarks, and displayed his service weapon to patrons at a bar. *Id*. at ¶ 30. When frequenting bars, Schuler typically wore his service weapon tucked into his waistband. *Id*. at ¶¶ 30, 43.

The City also knew or should have known that Schuler had a history of violence against Byrne in particular. *Id*. at ¶ 31. In November 2016, Schuler dragged Byrne down the stairs of his home and threw her out the door. *Id*. at ¶ 32. Schuler's brother, a CPD officer assigned to the BIA, reported this incident to the IPRA, *id*. at ¶ 33, but the City did not discipline Schuler, *id*. at ¶ 34. On numerous occasions from September 2017 to January 2018, Schuler, while intoxicated, held his gun to Byrne's head. *Id*. at ¶ 35.

According to Byrne, the City's refusal to meaningfully discipline Schuler for these incidents manifests a custom and unwritten policy of cover-ups, preferential treatment, and protection of police officers. *Id*. at ¶ 62. Had CPD properly disciplined or terminated Schuler,

he would not have had access to a firearm at the time of Byrne's 2018 shooting. *Id*. at ¶ 63. The City's failure to discipline Schuler encouraged him to act with impunity. *Id*. at ¶ 64.

## Discussion

### I. Section 1983 Claims

#### A. Claims Against Schuler

Byrne's § 1983 claims against Schuler allege excessive force under the Fourth Amendment and violation of her right to bodily integrity under the Fourteenth Amendment's Due Process Clause. *Id*. at ¶¶ 106-118. Schuler argues that the complaint's allegations do not permit a reasonable inference that he acted "under color of state law," as required to state a § 1983 claim. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1514 (7th Cir. 1990).

As the Seventh Circuit recently reiterated:

> A law enforcement officer can be liable under § 1983 if the officer deprives the plaintiff of a federally guaranteed right while acting under color of state law. Action is taken under color of state law when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. Not every action by a state official or employee occurs under color of state law. A state officer's conduct does not constitute acting under color of state law unless it is related in some way to the performance of the duties of the state office. Section 1983 does not cover disputes between private citizens, even if one happens to be an officer.

*Barnes v. City of Centralia*, __ F.3d __, 2019 WL 6318087, at *3 (7th Cir. Nov. 26, 2019) (internal quotation marks and citations omitted); *see also Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010) (same); *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995) ("Deciding whether a police officer acted under color of state law should turn largely on the nature of the specific acts the police officer performed."). "[W]hether or not a police officer is off-duty does not resolve the question of whether he or she acted under color of state law." *Gibson*, 910 F.2d at 1517; *see also Greco v. Guss*, 775 F.2d 161, 168-69 (7th Cir. 1985) (collecting cases).

4

"[B]ecause 'under "color" of law means under "pretense" of law,' any 'acts of officers in the ambit of their personal pursuits are plainly excluded.' Section 1983 does not cover disputes between private citizens, even if one happens to be an officer." *Plaats v. Barthelemy*, 641 F. App'x 624, 627 (7th Cir. 2016) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)).

As noted, the complaint alleges in the alternative that Schuler, while in his apartment, either encouraged his girlfriend Byrne to shoot herself with his gun or himself shot her. Because neither action related in any way to the performance of a police duty, Schuler is not alleged to have acted under color of state law. *See Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1267 (11th Cir. 2012) ("A law enforcement officer who gets into an after-hours dispute with [his] domestic partner that tragically escalates into a shooting does not act under color of law merely because the weapon used is the firearm the officer carries on duty."); *Bonsignore v. City of New York*, 683 F.2d 635, 638-39 (2d Cir. 1982) (holding that the defendant police officer did not act under color of state law when he shot and killed his wife, even though he was subject to a local regulation requiring police officers to carry a gun at all times within city limits). It necessarily follows that Byrne's § 1983 claims against Schuler must be dismissed.

Byrne retorts that Schuler acted under color of state law "because (1) CPD regulations considered him 'on duty' at all times, (2) this incident involved the use of Schuler's CPD service weapon, which he only possessed by virtue of his status as a police sergeant, and (3) Byrne knew that Schuler was a CPD sergeant." Doc. 55 at 3. These arguments fail to persuade. Even if Schuler was technically on duty that evening, even if Byrne was shot with Schuler's CPD-issued service weapon, and even if Byrne knew that Schuler was a CPD officer, governing precedent holds that the dispositive question is whether Schuler's conduct "related in some way to the performance of the duties of [his] office." *Wilson*, 624 F.3d at 392. Neither of Schuler's alleged

5

actions—encouraging Byrne after a night of drinking to shoot herself in the face, or shooting Byrne himself—bore any relationship to the performance of his police duties. Schuler accordingly was not acting under color of state law. *Compare Plaats*, 641 F. App'x at 627 (holding that a police officer was not acting under color of state law when he attacked the plaintiff for hitting on his fiancée); *Honaker v. Smith*, 256 F.3d 477, 485-86 (7th Cir. 2001) (same, for a fire chief who burned down the house of a person whom he viewed as a pest), *with Pickrel*, 45 F.3d at 1118 (same, where an off-duty police officer allegedly "was wearing his police uniform and displaying his badge, … was wearing his gun, … [h]is marked squad car was parked just outside, [and he] arrested [the plaintiff] and charged her with, among other things, resisting a peace officer"); *Davis v. Murphy*, 559 F.2d 1098, 1101 (7th Cir. 1977) (holding that off-duty police officers were acting under color of state law where they "immediately identified themselves as police officers[,] … were carrying their badges and guns," and "arrested the five plaintiffs and took them to jail where they were held [for] ten hours").

### B. *Monell* Claim Against the City

To state a municipal liability claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a plaintiff must allege "that an official policy or custom not only caused [a] constitutional violation, but was the moving force behind it." *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (internal quotation marks omitted). "An official policy or custom may be established by means of [1] an express policy, [2] a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or [3] through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012). Because Byrne does not allege any express policy or decision by an

6

official policymaker, the court assumes that she seeks to proceed under the widespread practice prong.

The complaint alleges a constitutional violation. The Due Process Clause protects bodily integrity against "very serious battery." *Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003). Byrne alleges that she was shot, Doc. 38 at ¶ 55, resulting in "serious and permanent … traumatic facial injuries," *id.* at ¶ 58, with "pieces of [her] jaw, tongue, teeth, and cheek … splattered" about, *id.* at ¶ 57. That qualifies as a "very serious battery" for purposes of the due process component of her *Monell* claim. *See Wudtke v. Davel*, 128 F.3d 1057, 1063 (7th Cir. 1997) (holding that "serious physical assault" constitutes a violation of the right to bodily integrity). Given this holding, it is unnecessary at this juncture to decide whether Byrne's being shot also qualifies as excessive force for purposes of the Fourth Amendment component of her *Monell* claim. *See generally Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) (noting Supreme Court decisions holding "that a person has a [Fourth Amendment] right not to be shot unless an officer reasonably believes that he poses a threat to the officer or someone else") (citing *Graham v. Connor*, 490 U.S. 386 (1989); *Tennessee v. Garner*, 471 U.S. 1 (1985)).

As the City observes, Byrne alleges in the alternative that she shot herself at Schuler's prodding. Doc. 44 at 3 (citing Doc. 38 at ¶ 56). But even if it would not have violated due process or the Fourth Amendment to prod Byrne to shoot herself, Rule 8(d)(2) allows Byrne to plead in the alternative and provides that where, as here, "a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2).

The complaint also adequately alleges that an official policy or custom of the City was the moving force behind the constitutional violation. Byrne alleges that the City failed (1) to discourage and to disallow a code of silence amongst CPD officers, Doc. 38 at ¶¶ 123-127; (2) to

7

investigate CPD misconduct adequately and impartially, *id*. at ¶¶ 128-133; (3) to implement an early warning system to detect and intervene with corrective measures for potentially dangerous officers, *id*. at ¶¶ 134-141; (4) to re-train or to discipline officers accused of misconduct, *id*. at ¶¶ 142-147; and (5) to terminate problematic officers, *id*. at ¶¶ 148-152. The complaint further alleges that those policies and practices were the moving force behind Byrne's injuries because they "caused [Schuler] to act with impunity and to feel and act as though his acts of misconduct would go unpunished and uninvestigated." *Id*. at ¶¶ 64; *see also id*. at ¶¶ 153-56 (further alleging causation). These allegations suffice to forestall dismissal at the pleading stage. *See Sledd v. Lindsay*, 102 F.3d 282, 289 (7th Cir. 1996) (holding that the district court wrongly dismissed a *Monell* claim where the complaint alleged "that the City and [its police department] maintained a code of silence; that disciplinary complaints almost never resulted in official censure; and that this practice hurt [the plaintiff] … by making the officers believe their actions would never be scrutinized."); *see also Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 479–80 (7th Cir. 1997) (noting that the *Monell* claim in *Sledd* set forth "the number of excessive force complaints filed against the [CPD], the number of complaints which were investigated, and the number which the Police Department's [OPD] believed had merit").

The City retorts that it cannot be held liable under *Monell* because Schuler did not act under color of state law. Doc. 44 at 9. This argument fails to recognize that, for purposes of *Monell* liability, the pertinent state action is the City's, not Schuler's. That is precisely why the "conclusion that [an officer] did not act under color of state law does not permit summary judgment on [a] municipal liability claim." *Gibson*, 910 F.2d at 1519. As the Seventh Circuit explained: "On a municipal liability claim, the City policy itself must cause the constitutional deprivation. Therefore, the municipality itself is the state actor and its action in maintaining the

8

alleged policy at issue supplies the 'color of law' requirement under § 1983." *Ibid*. (allowing a *Monell* claim to proceed where the plaintiff alleged that "the City's policy of allowing a deranged police officer [who was not acting under color of state law] to retain his service revolver and bullets is the state action that deprived [the plaintiff's decedent] of his life").

The City's invocation of *DeShaney v. Winnebago County*, 489 U.S. 189 (1989), is unpersuasive as well. Doc. 44 at 9-13. The plaintiff in *DeShaney* alleged that a municipality violated due process by failing to prevent a father's abuse of his child. 489 U.S. at 193. The Supreme Court rejected the claim, holding that "nothing in the language of the Due Process Clause itself require[d] the State to protect the life, liberty, and property of [the child] against invasion by [the father]." *Ibid*. *DeShaney* is inapposite. While the municipality in *DeShaney* was alleged to have *failed to act* to prevent private violence, Byrne alleges that the City *acted* by implementing unofficial policies and customs that put Schuler in a position to injure her. Doc. 38 at ¶¶ 123-152. In any event, *DeShaney* acknowledged that it had nothing to say about *Monell*. *See DeShaney*, 489 U.S. at 202, n.10 ("[The Court] ha[s] no occasion to consider … whether the allegations in the complaint are sufficient to support a § 1983 claim … under *Monell*.").

In the end, the complaint alleges "that an official policy or custom … caused [a] constitutional violation, [and] was the moving force behind [the violation]." *Estate of Sims ex rel. Sims*, 506 F.3d at 514 (internal quotation marks omitted). That suffices to state a *Monell* claim.

## II. State Law Claims

### A. Claim Against Schuler

Byrne's sole state law claim against Schuler is for negligence. Doc. 38 at ¶¶ 160-162. Schuler seeks dismissal only on the ground that the court should invoke 28 U.S.C. § 1367(c)(3) to relinquish its supplemental jurisdiction over the negligence claim upon dismissing all of

9

Byrne's federal claims. Doc. 42 at 6. Because Byrne's *Monell* claim against the City survives dismissal, Schuler's argument for dismissing the negligence claim fails.

### B. Claims Against the City

Byrne's state law claims against the City are for battery, negligence, willful and wanton conduct, *respondeat superior*, and indemnification. Doc. 38 at ¶¶ 157-59, 163-184.

#### 1. *Respondeat Superior* and Indemnification

Byrne alleges that the City is liable "under the doctrine of *respondeat superior* … on [her] state law claims" against Schuler, *id*. at ¶ 183, and that the City "must indemnify [Schuler] on Byrne's federal claims [against Schuler] pursuant to [745] ILCS 10/9-102," *id*. at ¶ 184. Because Byrne's federal claims against Schuler have been dismissed, the indemnification claim against the City is dismissed as well. As for the *respondeat superior* claim, the City moves for dismissal on the ground that "the allegations of [the complaint] make clear that Schuler was acting outside the scope of his employment." Doc. 44 at 14.

The City's *respondeat superior* liability for Schuler's conduct turns on whether he was acting "within the scope of [his] employment." *Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996). "To ascertain when an employee's conduct is within the scope of employment, the Illinois Supreme Court has adopted § 228 of the Restatement (Second) of Agency." *Copeland v. Cnty. of Macon*, 403 F.3d 929, 932 (7th Cir. 2005) (citing *Pyne v. Witmer*, 543 N.E.2d 1304, 1308 (Ill. 1989)). Section 228 provides in pertinent part:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>     (a) it is of the kind he is employed to perform;
>     (b) it occurs substantially within the authorized time and space limits; [and]
>     (c) it is actuated, at least in part, by a purpose to serve the master … .

Restatement (Second) of Agency § 228 (1958). These three requirements must be satisfied to find that an employee acted within the scope of his employment. *See Adames v. Sheahan*, 909

N.E.2d 742, 755 (Ill. 2009). Section 228 applies to police officers and their municipal employers. *See Doe v. City of Chicago*, 360 F.3d 667, 674 (7th Cir. 2004).

Byrne cannot satisfy the first requirement because her factual allegations do not plausibly suggest that Schuler's shooting Byrne or encouraging her to shoot herself was conduct that the CPD employed Schuler to perform. Nor can Byrne satisfy the third requirement, as it cannot possibly be said that Schuler's conduct was actuated in any way by a purpose to serve CPD. It follows that the City is not vicariously liable for Schuler's alleged state law tortious conduct. *See Doe*, 360 F.3d at 674 (rejecting *respondeat superior* liability when the connection between an officer's traffic stop and his subsequent harassment of the plaintiff was too attenuated to be within the scope of his employment); *Copeland*, 403 F.3d at 932-936 (same, where a correctional officer recruited inmates to assault another inmate).

### 2. Battery, Negligence, and Willful and Wanton Conduct Claims

The City argues that the court should dismiss Byrne's battery, negligence, and willful and wanton conduct claims because the complaint's allegations "make clear that Schuler was acting outside the scope of his employment." Doc. 44 at 14. Although that argument is pertinent to Byrne's *respondeat superior* claim, the City's initial brief does not explain how it pertains to the battery, negligence, and willful and wanton claims; the City's reply brief does not do much better, and even if it did, those arguments would have been forfeited. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.").

### Conclusion

Defendants' motions to dismiss are granted in part and denied in part. Byrne's § 1983 claims against Schuler are dismissed, as are her state law *respondeat superior* and

indemnification claims against the City. The dismissals are with prejudice because Byrne has already amended her complaint and does not request leave to amend or suggest how another amendment might cure the defects identified by the present motions. *See Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018) ("Nothing in Rule 15, nor in any of our cases, suggests that a district court must give leave to amend a complaint where a party does not request it or suggest to the court the ways in which it might cure the defects. To the contrary, we have held that courts are within their discretion to dismiss with prejudice where a party does not make such a request or showing."); *Gonzalez-Koeneke v. West*, 791 F.3d 801, 808 (7th Cir. 2015) ("A district court acts within its discretion in … dismissing a complaint with prejudice ... when the plaintiff fails to demonstrate how [an] amendment would cure the deficiencies in the prior complaint."). Byrne's *Monell* claim and state law battery, negligence, and willful and wanton conduct claims against the City may proceed, as may her state law negligence claim against Schuler. Defendants shall answer the surviving portions of the operative complaint by December 20, 2019.

December 5, 2019

_____
United States District Judge